HARVINDER S. ANAND (SBN 243913)
ANAND LAW GROUP, P.C.
790 E. Colorado Boulevard, Suite 900
Pasadena, California 91101
Phone: (626) 239-7250
Fax: (626) 239-7150
Email: harv@anandlawgroup.com

Attorneys for Plaintiff
Samick Music Corp., dba "Health Mate"

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMICK MUSIC CORP., dba HEALTH MATE, <br><br> Plaintiff, <br><br> v. <br><br> GARRETT GORDON, an individual; NAOMI MASON, a.k.a. "KALI MASON," an individual; and DOES 1 THROUGH 25, inclusive, <br><br> Defendants. | Case No. 8:20-cv-00395 GW (JDEx) <br><br> **PLAINTIFF'S NOTICE OF AND *EX PARTE* APPLICATION FOR ISSUANCE OF TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> **[DECLARATIONS OF COREY SMEE AND HARVINDER S. ANAND AND [PROPOSED] ORDER FILED CONCURRENTLY HEREWITH]** |

-1-

**TO THE COURT AND TO ALL PARTIES AND THEIR
ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** pursuant to Federal Rule of Civil
Procedure 65, 15 U.S.C. § 1116(a), 15 U.S.C. § 1125(d)(1)(C), 18 U.S.C.
§ 1836(b)(3)(A), 28 U.S.C. § 1651(a), California Civil Code § 3426.2(a),
California Business and Professions Code § 17203, and Civil Local Rule 7-19,
Plaintiff Samick Music Corp., doing business as "Health Mate" ("Plaintiff" or
"Health Mate") hereby applies *ex parte* for the issuance of a temporary restraining
order and order to show cause re: preliminary injunction against Defendant Garrett
Gordon ("Defendant Gordon").

Specifically, Plaintiff respectfully seeks, *inter alia*:

1.      Entry of an order restraining and enjoining Defendant Gordon and his
officers, agents, servants, employees, representatives, associates, related corporate
entities, owners, and operators, and/or all persons acting for, on behalf of, or in
concert or cooperation with any of them, including but not limited to Defendant
Naomi Mason, also known as "Kali Mason" ("Defendant Mason"):

a.      From further acts of infringement of the trademarks at issue in
this litigation, including by inducing or contributing third parties to infringe.

b.      From further acts of infringement of the Health Mate trade,
domain, and corporate names at issue in this litigation, including by inducing or
contributing third parties to infringe.

c.      From assigning, transferring or otherwise hypothecating the
healtmateparts.com domain name to anyone other than to Plaintiff.

d.      From registering any domain name that includes "Health Mate"
or any confusingly similar combination of words.

e.      From further acts of cyberpiracy at issue in this litigation,
including by inducing or contributing third parties to commit cyberpiracy.

f.      From assigning, transferring or otherwise hypothecating the

-2-

1    "healthmatesaunas@gmail.com" email account to anyone other than to Plaintiff.

2            g.      From assigning, transferring or otherwise hypothecating the

3    "Healthmatesaunaoffical@gmail.com" email account to anyone other than to

4    Plaintiff.

5            h.      From directly or indirectly accessing, using, transferring,

6    transmitting, assigning, disclosing, or making available to any person or entity

7    other than Plaintiff, any of Plaintiff's confidential, proprietary, or trade secret

8    documents, data or information, including but not limited to the information

9    contained in the customer resource management database known as Pipedrive.

10           i.      From further acts of misappropriation of trade secrets at issue in

11   this litigation, including the use or retention of any of Plaintiff's confidential and

12   trade secret information remaining in the possession, custody, or control of

13   Defendant Gordon or Defendant Mason, in the solicitation of customers or

14   potential customers for the sale of any products.

15           j.      From further acts of unfair competition and/or false advertising

16   against Plaintiff.

17   2.      Entry of an order requiring Defendant Gordon and his officers, agents,

18   servants, employees, representatives, associates, related corporate entities, owners,

19   and operators, and/or all persons acting for, on behalf of, or in concert or

20   cooperation with any of them (including but not limited to Defendant Mason) to:

21           a.      Forthwith take all necessary steps and actions to assist the

22   registrar in transferring the "healtmateparts.com" domain name to Plaintiff.

23           b.      Forthwith instruct any print directory, Internet directory, or

24   website, including but not limited to You Tube, carrying or displaying the Health

25   Mate trade name, the HEALTH MATE Trademarks, and/or the HEALTH MATE

26   Logo or any other confusingly similar combination that includes the words "Health

27   Mate," either alone or in combination with other words or symbols, to cease

28   carrying or displaying such marks and/or trade name in connection with the sale,

1   offering for sale, distribution, or advertising of sauna and sauna-related products by
2   Defendant Gordon.

3          c.    Forthwith transfer any and all website content associated with
4   the "healtmateparts.com" domain name to Plaintiff.

5          d.    Forthwith take all necessary steps and actions to transfer the
6   "healthmatesaunas@gmail.com" email account to Plaintiff.

7          e.    Not alter, modify, forward, or delete any email stored anywhere
8   in the "healthmatesaunas@gmail.com" email account, prior to the transfer of that
9   account to Plaintiff.

10          f.    Forthwith take all necessary steps and actions to transfer the
11   "Healthmatesaunaoffical@gmail.com" email account to Plaintiff.

12          g.    Not alter, modify, forward, or delete any email stored anywhere
13   in the "Healthmatesaunaoffical@gmail.com" email account, prior to the transfer of
14   that account to Plaintiff.

15          h.    Forthwith return to Plaintiff all copies of any of Plaintiff's
16   confidential, proprietary, or trade secret documents, data or information, including
17   but not limited to the information contained in the Customer Resource
18   Management database known as Pipedrive, that is in the possession, custody, or
19   control of Defendant Gordon or his officers, agents, servants, employees,
20   representatives, associates, related corporate entities, owners, and operators, and/or
21   all persons acting for, on behalf of, or in concert or cooperation with any of them,
22   including but not limited to Defendant Mason.

23       3.    Entry of an order that the domain registrar transfer the
24   healtmateparts.com domain name to Plaintiff forthwith.

25       Plaintiff further respectfully requests that the Court issue an order requiring
26   Defendant Gordon to show cause why a preliminary injunction should not be
27   entered pending trial, set a hearing on that issue at a time convenient for the Court,
28   and set a briefing schedule.

**PLAINTIFF'S *EX PARTE* APPLICATION FOR TRO AND OSC RE: PI**

Finally, Plaintiff respectfully requests that the Court order Defendant Gordon to file and serve a report under oath within 30 days setting forth in detail the manner and form in which Defendant Gordon has complied with the Court's orders.  *See* 15 U.S.C. § 1116(a) (permitting court to order such a report); *see also* 18 U.S.C. § 1836(b)(3)(A)(ii) (providing court may issue injunction "requiring affirmative actions to be taken to protect the trade secret").

Good cause exists to grant the injunctive relief that Plaintiff requests. Samick has commenced an action to enjoin and redress serial violations of federal and California law by Defendant Gordon and Defendant Mason (together, "Defendants") to misappropriate Health Mate's customers and business.  Among other things, Defendants have adopted and used without authorization Plaintiff's trademarks and the Health Mate corporate and trade names; counterfeited Plaintiff's trademarks; committed cyberpiracy by incorporating and using Health Mate's name in a competing domain and website; misrepresented to customers they were affiliated with Health Mate by purporting to send emails from Health Mate's proprietary domain; stolen Health Mate's trade dress; misappropriated Plaintiff's trade secrets; and engaged in unethical and unfair business competition, all to divert Health Mate's customers and business to themselves.

Until July 2019, Health Mate retained Defendant Gordon as a consultant. Upon being terminated, Defendant Gordon repeatedly threatened Health Mate, including by stating that Defendant Gordon would "take down fucking Health Mate to the bones."  Since making those threats, Defendants Gordon and Mason, who works for and with Defendant Gordon, have engaged in a concerted and malicious campaign to misappropriate Health Mate's customers and business while simultaneously harming Health Mate's name, reputation, and goodwill.

Defendants have used Health Mate's proprietary customer list and stolen Health Mate's trademarks, trade name, and corporate name to sell the very same products—saunas and sauna replacement parts—that Health Mate has sold in the

United States since 1979; posted false and defamatory reviews about Health Mate on Yelp under fictitious customer names, to both harm Health Mate and divert business opportunities to Defendants Gordon and Mason; and attacked Health Mate's website three times, causing it to crash on one occasion.

Accordingly, Plaintiff seeks an injunction, including a temporary restraining order, to enjoin Defendant Gordon from continuing to engage in unlawful actions, and monetary damages, including disgorgement of illegal profits obtained by Defendants Gordon and Mason.

This *ex parte* application is based on this Notice; the attached Memorandum of Points and Authorities; the concurrently filed Declarations of Corey Smee and Harvinder S. Anand and the exhibits thereto; the Complaint filed in this action; such other matters of which this Court may take judicial notice; and such further argument and evidence as may be presented at or before any hearing on this application. A proposed order is respectfully submitted herewith.

As set forth in the Declaration of Harvinder S. Anand, Plaintiff gave appropriate notice of this application to Defendant Gordon when he was personally served with the Summons, Complaint, and other documents relating to this case. Defendant Gordon was personally served with notice on March 8, 2020, at his last known address: 2271 Aria Drive, Henderson, NV 89052.

On March 13, 2020, Plaintiff will serve a copy of these moving papers on Defendant Gordon by overnight mail and by email link. Plaintiff has not received notice whether Defendant Gordon will oppose this application. Defendant shall have 24 hours to submit his papers in opposition to this application.

Dated: March 13, 2020                    Respectfully submitted,

ANAND LAW GROUP, P.C.

By:  /s/ Harvinder S. Anand
HARVINDER S. ANAND
   Attorneys for Plaintiff
   Samick Music Corp.,
   dba "Health Mate"

-6-

# TABLE OF CONTENTS

**Page**

INTRODUCTION……………………………………..……………...1

SUMMARY OF FACTS………………………………………..…………1

I.      Health Mate's History, Business and Valuable
        Intellectual Property ……………………………………..…………..1

II.     Defendant Gordon Maliciously Threatened to Harm
        Health Mate in July 2019, Immediately After the
        Company Terminated Him…..……………………………………3

III.    Defendants Gordon and Mason Have Committed
        Trademark Infringement and Misappropriated Health
        Mate's Business…..…………………………………………4

        A.      Misappropriation of Health Mate's Trade Secrets …..……………….4

        B.      Defendants Have Used Information in Pipedrive
                to Sell Saunas Using Health Mate's Trade Name ……………...……5

        C.      Defendants Also Used Health Mate's Trademarks
                and Logo to Sell Parts on a Competing Website ……………..……...7

IV.     Defendants Have Harmed Health Mate by Causing Its
        Website to Crash and by Posting Numerous False Negative
        Reviews…..…………………………………………...10

ARGUMENT………………………………………..……………11

I.      Standards for Issuing a Temporary Restraining Order…………………...11

II.     Plaintiff Is Entitled to an Immediate Restraining Order
        to Stop Defendants' Ongoing Violations of Law ……………………12

        A.      Plaintiff Is Likely to Succeed on the Merits of Its
                Trademark Infringement and Trademark Counterfeiting
                Claims …..…………………………………………...12

-i-

# TABLE OF CONTENTS
## (continued)

**Page**

1.    Applicable Legal Standards……………….……………12

2.    Plaintiff Owns the Protectable HEALTH MATE Marks……...13

3.    Consumers Are Likely to Be Confused as to the Source of Defendants' Products …………………………14

4.    Plaintiff Is Likely to Succeed on the Merits of Its California Common Law Trademark Infringement and Unfair Business Practices Claims ………….15

B.    Plaintiff Is Likely to Succeed on the Merits of Its Claim for Federal Trademark and Trade Name Infringement, Federal False Designation of Origin, and Unfair Competition …...…………………………………16

C.    Plaintiff Is Likely to Succeed on the Merits of Its Federal Trademark Dilution Claim…...…………………18

D.    Plaintiff Is Likely to Succeed on the Merits of Its Cyberpiracy Claim …...…………………………………20

E.    Plaintiff Is Likely to Succeed on the Merits of Its Federal and State Claims for Trade Secret Misappropriation …...…………………………………22

1.    Plaintiff's PipeDrive Customer Resource Management Software Contains Confidential Customer Trade Secrets …………………..………………23

2.    Defendants Have Misappropriated Plaintiffs' Trade Secrets by Retaining and Using the Information in Pipedrive…………………………………..25

-ii-

1
2

## **TABLE OF CONTENTS**
## **(continued)**

3

**Page**

4
5
6

III.   Defendants Have Caused and Will Continue to Cause
       Irreparable Harm to Plaintiff If Injunctive Relief Is
       Not Granted …………………………………………………...29

7
8

  A.   The Court Has Authority to Enjoin Each of
         Defendants' Violations…..………………………………..29

9
10

  B.   A Temporary Restraining Order Is
         Necessary…..……………………………………………29

11
12

IV.   The Balance of Harms Strongly Favors Plaintiff………………...............32

13
14

V.   The Public Interest Also Strongly Favors Preventing
      Defendants from Continuing to Violate the Law ………………...............34

15
16

VI.   The Court Should Not Require Plaintiff to Post a
       Bond……………….......…………………………………………34

17
18

VII.   Defendants' Misconduct Justifies Additional
        Relief……………….......………………………………………34

19

CONCLUSION………………………………………..………………35

20
21
22
23
24
25
26
27
28

**PLAINTIFF'S *EX PARTE* APPLICATION FOR TRO AND OSC RE: PI**

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases:**

4    *Accuride International, Inc. v. Accuride Corp.*,

5        871 F.2d 1531 (9th Cir. 1989)....................................................16, 17

6    *All. for the Wild Rockies v. Cottrell*,

7        632 F.3d 1127 (9th Cir. 2011) ...................................................11, 12

8    *Am. Auto. Ass'n, Inc. v. AAA Towing/Impound Yard, Inc.*,

9        2018 WL 4693854 (C.D. Cal. Apr. 26, 2018) ..................................35

10   *Apple, Inc. v. Samsung Elecs. Co.*,

11       920 F. Supp. 2d 1079 (N.D. Cal. 2013)..........................................19

12   *Applied Info. Scis. Corp. v. eBay, Inc.*,

13       511 F.3d 966 (9th Cir. 2007)..........................................................12

14   *Art Attacks Ink, LLC v. MGA Entertainment, Inc.*,

15       581 F.3d 1138 (9th Cir. 2009)..................................................22 n.5

16   *AUA Private Equity Partners, LLC v. Soto*,

17       2018 U.S. Dist. LEXIS 58356 (S.D.N.Y. Apr. 5, 2018) ............26, 27

18   *Brocade Communs. Sys. v. A10 Networks, Inc.*,

19       873 F. Supp. 2d 1192 (N.D. Cal. 2012)....................................24, 25

20   *Brookfield Commc'ns., Inc. v. W. Coast Entm't Corp.*,

21       174 F.3d 1036 (9th Cir. 1999)..............................................14, 15, 30

22   *Cadence Design Sys., Inc. v. Avant! Corp.*,

23       125 F.3d 824 (9th Cir. 1997)..........................................................32

24   *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*,

25       2017 U.S. Dist. LEXIS 62109 (N.D. Cal. Apr. 24, 2017)................25

26   *Century 21 Real Estate Corp. v. Sandlin*,

27       846 F.2d 1175, 1178 (9th Cir. 1988) ....................................15, 29, 30

28

**PLAINTIFF'S *EX PARTE* APPLICATION FOR TRO AND OSC RE: PI**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Century 21 Real Estate, LLC v. Ramron Enters.*,
  2015 U.S. Dist. LEXIS 15480 (E.D. Cal. Feb. 9, 2015) ...................................16

*Cleary v. News Corp.*,
  30 F.3d 1255 (9th Cir. 1994)........................................................................15

*Coca-Cola Co. v. Purdy*,
  382 F.3d 774 (8th Cir. 2004)............................................................ 20 n.4, 21

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
  539 U.S. 23 (2003)........................................................................................12

*DC Comics v. Towle*,
  989 F. Supp. 2d 948 (C.D. Cal. 2013),
  *aff'd* 802 F.3d 1012 (9th Cir. 2015) ..................................... 12, 13, 15

*Dr. Seuss Enters. v. Penguin Books USA, Inc.*,
  109 F.3d 1394 (9th Cir. 1997)...............................................................13 n.2

*DSPT Int'l, Inc. v. Nahum*,
  624 F.3d 1213 (9th Cir. 2010).................................................................20, 21

*EarthGrains Baking Cos. v. Sycamore*,
  721 Fed. Appx. 736 (10th Cir. 2017) (unpublished).........................................29

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
  967 F.2d 1280 (9th Cir. 1992)......................................................................13

*Excelligence Learning Corp. v. Oriental Trading Co.*,
  2004 U.S. Dist. LEXIS 30370 (N.D. Cal. Dec. 20, 2004)................................27

*First Command Fin. Planning, Inc. v. Velez*,
  2017 U.S. Dist. LEXIS 221757 (N.D. Texas May 8, 2017) ............................27

**PLAINTIFF'S *EX PARTE* APPLICATION FOR TRO AND OSC RE: PI**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Freecycle Network, Inc. v. Oey*,

   505 F.3d 898 (9th Cir. 2007) ........................................................... 17

*F.T.C. v. John Beck Amazing Profits, LLC*,

   2009 U.S. Dist. LEXIS 130923 (C.D. Cal. Nov. 17, 2009) ............................ 34

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*,

   415 U.S. 423 (1974) ....................................................................... 11

*GSI Tech., Inc. v. United Memories, Inc.*,

   2015 WL 1802616 (N.D. Cal. Apr. 20, 2015) ......................................... 24 n.6

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,

   286 F.Supp.2d 284 (S.D.N.Y. 2003) ..................................................... 13, 15

*Hand & Nail Harmony, Inc. v. ABC Nail & Spa Prods.*,

   2017 U.S. Dist. LEXIS 59970 (C.D. Cal. Apr. 19, 2017) ................................ 15

*Henry Schein, Inc. v. Cook*,

   191 F. Supp. 3d 1072 (N.D. Cal. 2016) .................................................. 34, 35

*Herb Reed Enterprises, LLC v. Florida Entm't Mgmt.*, Inc.,

   736 F.3d 1239 (9th Cir. 2013) ........................................................... 30

*Horphag Research Ltd. v. Garcia*,

   475 F.3d 1029 (9th Cir. 2007) ........................................................... 19

*H.Q. Milton, Inc. v. Webster*,

   2017 U.S. Dist. LEXIS 193646 (N.D. Cal. Nov. 22, 2017) ........................... 27, 32

*Int'l Order of Job's Daughters v. Lindeburg & Co.*,

   633 F.2d 912 (9th Cir. 1980) ............................................................. 17

*Internet Specialties West, Inc. v. Milon-Digiorgio Enters.*,

   559 F.3d 985 (9th Cir. 2009) ............................................................. 32

**PLAINTIFF'S *EX PARTE* APPLICATION FOR TRO AND OSC RE: PI**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*,
 407 F.3d 1027 (9th Cir. 2005) ................................................................ 16, 31

*JL Beverages Co. LLC v. Jim Beam Brands*,
 828 F.3d 1098 (9th Cir. 2016) ....................................................................... 17

*Johnson v. Couturier*,
 572 F.3d 1067 (9th Cir. 2009) ....................................................................... 34

*Johnson v. Macy*,
 145 F. Supp. 3d 907 (C.D. Cal. 2015) ......................................................... 11

*Jorgensen v. Cassiday*,
 320 F.3d 906 (9th Cir. 2003) ......................................................................... 34

*Lahoti v. VeriCheck, Inc.*,
 586 F.3d 1190 (9th Cir. 2009) ................................................................. 22 n.5

*Lions Gate Entm't, Inc. v. TD Ameritrade Holding Corp.*,
 2016 U.S. Dist. LEXIS 101234 (C.D. Cal. Aug. 1, 2016) ............................. 18

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
 658 F.3d 936 (9th Cir. 2011) ................................................................... 14, 15

*Louis Vuitton Malletier & Oakley, Inc. v. Veit*,
 211 F. Supp. 2d 567 (E.D. Pa. 2002) ........................................................... 21

*Mackintosh v. Lyft, Inc.*,
 2019 U.S. Dist. LEXIS 190252 (E.D. Cal. Oct. 31, 2019) ....................... 23, 25

*MAI Sys. Corp. v. Peak Computer, Inc.*,
 991 F.2d 511 (9th Cir. 1993) ............................................................. 24, 25, 28

*Moroccanoil, Inc. v. Moroccan Gold*, LLC,
 590 F. Supp. 2d 1271 (C.D. Cal. 2008) .............................................. 32, 33, 34

**PLAINTIFF'S *EX PARTE* APPLICATION FOR TRO AND OSC RE: PI**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Moseley v. V Secret Catalogue*,
  537 U.S. 418 (2003)........................................................................................18

*Nestlé USA, Inc. v. Gunther Grant, Inc.*,
  2014 U.S. Dist. LEXIS 198812 (C.D. Cal. May 13, 2014)................... 13, 15, 30

*New W. Corp. v. NYM Co.*,
  595 F.2d 1194 (9th Cir. 1979)..................................................................17, 31

*Panavision Int'l, L.P. v. Toeppen*,
  141 F.3d 1316 (9th Cir. 1998)........................................................................19

*Q-Co Indus., Inc. v. Hoffman*,
  625 F. Supp. 608 (S.D.N.Y. 1985)................................................................28

*Rearden LLC v. Rearden Commerce, Inc.*,
  683 F.3d 1190 (9th Cir. 2012)..................................................................15, 16

*S. Cal. Darts Ass'n v. Zaffina*,
  762 F.3d 921 (9th Cir. 2014)..........................................................................16

*Smith v. Guerilla Union, Inc.*,
  2019 U.S. Dist. LEXIS 60309 (C.D. Cal. Apr. 18, 2019).................... 29, 31, 32

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001)..........................................................................32

*Sun Distrib. Co., LLC v. Corbett*,
  2018 U.S. Dist. LEXIS 176224 (S.D. Cal. Oct. 12, 2018)........................*passim*

*Super-Krete Int'l, Inc. v. Sadleir*,
  712 F. Supp. 2d 1023 (C.D. Cal. 2010)................................................ 30, 31, 32

**PLAINTIFF'S *EX PARTE* APPLICATION FOR TRO AND OSC RE: PI**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Toyo Tire & Rubber Co. v. Kabusikiki Kaisha Tokyo Nihoon Rubber Corp.*,
   2015 U.S. Dist. LEXIS 146294 (D. Nev. Oct. 26, 2015) ................................. 30

*Triad Sys. Corp. v. Se. Express Co.*,
   64 F.3d 1330 (9th Cir. 1995),
   *superseded on other grounds as stated in Apple, Inc. v. Psystar Corp.*,
   658 F.3d 1150 (9th Cir. 2011) ....................................................... 33

*Twitch Interactive, Inc. v. Johnston,*
   2018 U.S. Dist. LEXIS 184300 (N.D. Cal. Jan. 22, 2018) ............................... 31

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
   505 U.S. 763 (1992) ......................................................... 16, 34

*UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*,
   617 F. Supp. 2d 938 (N.D. Cal. 2007) ................................................ 28

*Visa Int'l Serv. Ass'n v. JSL Corp.*,
   610 F.3d 1088 (9th Cir. 2010) ....................................................... 19

*Wecosign, Inc. v. IFG Holdings, Inc.*,
   845 F. Supp. 2d 1072 (C.D. Cal. 2012) ............................................... 30

*WHIC LLC v. NextGen Labs., Inc.*,
   341 F. Supp. 3d 1147 (D. Haw. 2018) ................................................ 32

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................... 11

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*,
   419 F.3d 925 (9th Cir. 2005) ........................................................ 14

**PLAINTIFF'S *EX PARTE* APPLICATION FOR TRO AND OSC RE: PI**

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**Statutes:**

15 U.S.C. § 1052(f)................................................................22 n.5

15 U.S.C. § 1114(1)................................................................16

15 U.S.C. § 1114(1)(a)............................................................12

15 U.S.C. § 1114(1)(b)............................................................12

15 U.S.C. § 1116(a).................................................29, 31, 32, 35

15 U.S.C. § 1125(a)..........................................................16, 31

15 U.S.C. § 1125(a)(1)(A)........................................................17

15 U.S.C. § 1125(c)(1)............................................................18

15 U.S.C. § 1125(c)(2)(B)....................................................18 n.3

15 U.S.C. § 1125(c)(2)(C)....................................................18 n.3

15 U.S.C. § 1125(d)..............................................20, 21, 29

15 U.S.C. § 1125(d)(1)(B)(i)................................................21, 22

15 U.S.C. § 1125(d)(1)(C)........................................................29

15 U.S.C. § 1127................................................................17

18 U.S.C. § 1836(b)(3)(A)........................................................29

18 U.S.C. § 1836(b)(3)(A)(ii)................................................32, 35

18 U.S.C. § 1839(3)..........................................................23, 24 n.6

18 U.S.C. § 1839(5)..............................................................25

18 U.S.C. § 1839(5)(A)..........................................................25

18 U.S.C. § 1839(6)..............................................................25

28 U.S.C. § 1651(a)..............................................................32

Cal. Bus. & Prof. Code § 17200..................................................15

Cal. Civ. Code § 3426.2(a)......................................................29

**PLAINTIFF'S *EX PARTE* APPLICATION FOR TRO AND OSC RE: PI**

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

<u>**INTRODUCTION**</u>

In July 2019, Plaintiff Samick Music Corp., doing business as "Health Mate" ("Health Mate" or "Samick") decided to have its own employees perform certain functions that Defendant Garret Gordon ("Gordon") had been performing as a consultant.  When Samick informed Gordon that it would no longer require his services, he responded by maliciously threatening Health Mate.  Among other things, Gordon said to "[g]ive [him] a week and let's see what fucking happens" and that he would "take down fucking Health Mate to the bones."

Those were not just idle threats.  Aided and abetted by Defendant Naomi Mason ("Mason"), who works for and with Gordon, Defendants deliberately have executed a concerted campaign to harm Health Mate and misappropriate its customers and business.  Among other things, Defendants have stolen Health Mate's trademarks and trade name and used its trade secrets to sell the very same products (saunas and sauna replacement parts) to customers; committed cyberpiracy; attacked Health Mate's website; and posted numerous false reviews about Health Mate on Yelp.  Defendants' actions have been flagrant, malicious, and spiteful.  Health Mate has suffered and will continue to suffer irreparable harm.  The Court should enter the temporary restraining order requested herein.

<u>**SUMMARY OF FACTS**</u>

**I.    <u>Health Mate's History, Business and Valuable Intellectual Property.</u>**

In October 2018, Samick acquired the assets of PLH Products, Inc. ("PLH"), including PLH's business operations, the right to use the "Health Mate" trade name, the trademarks that are at issue in this case, and all the goodwill associated with PLH's business and trademarks.  PLH, which was founded in 1979, had used the trade name "Health Mate" extensively and had used the HEALTH MATE trademarks since March 1993.  Accordingly, all references to Health Mate's history, its business operations, its goodwill, and its ownership and use of the

HEALTH MATE trademarks include PLH's history, business operations, and goodwill, and PLH's ownership and use of the trademarks, which were acquired by Samick.  (Declaration of Corey Smee, dated March 12, 2020 ("Smee Decl.") ¶ 4.)

Health Mate manufactures and sells infra-red saunas to consumers throughout the United States, Europe, and Asia.  It has been selling various types of saunas since 1979, making it a leader in the sauna industry.  (*Id.* ¶¶ 5-6.)

Plaintiff has incurred costs to secure and protect its intellectual property interests.  It owns four federally registered distinctive "HEALTH MATE" Trademarks, including the distinctive "HEALTH MATE" Logo.  Health Mate has been using the marks in the sauna industry since as early as March 1993, *i.e.* for almost 27 years.  As a result of Plaintiff's exclusive and substantial use of the HEALTH MATE Trademark for almost 27 years and its exclusive and substantial use of the Logo for almost 5 years, both the Trademark and Logo have come to uniquely distinguish Health Mate's products from those offered by its competitors.  (*Id.* ¶¶ 7-14 & Exhs. 1-4.)

Plaintiff has spent substantial sums to advertise and promote the HEALTH MATE Trademark and the Logo.  As a result, the Health Mate trade names, the HEALTH MATE Trademark, and the HEALTH MATE Logo have achieved a reputation for excellence in the sauna industry.  Plaintiff enjoys substantial demand and goodwill for the products it markets and sells using its Trademarks and Logo. The Trademark and Logo are significant assets of Plaintiff's business.  The relevant public has come to exclusively associate the HEALTH MATE Trademark and HEALTH MATE Logo with saunas and sauna-related products that originate from Plaintiff.  (*Id.* ¶¶ 15-23.)

In addition to using the trade name "Health Mate," Plaintiff also uses the trade names "Health Mate Sauna" and "Health Mate Wellness" in connection with the sale of its products.  The relevant public has come to exclusively associate these trade names with Plaintiff's saunas and sauna replacement parts.  (*Id.* ¶ 15.)

**PLAINTIFF'S *EX PARTE* APPLICATION FOR TRO AND OSC RE: PI**

## II. **Defendant Gordon Maliciously Threatened to Harm Health Mate in July 2019, Immediately After the Company Terminated Him.**

For approximately five years, Gordon provided marketing, website support, and customer support services to Health Mate as a consultant. With the authorization of Health Mate, Gordon also sold replacement parts to customers who owned Health Mate saunas that were no longer under product warranty. Gordon purchased the Health Mate-certified replacement parts directly from Plaintiff and he was authorized to resell those parts to its customers under the supervision of Health Mate.[1] (*Id.* ¶¶ 24-25.)

On July 20, 2019, Andrew You, Health Mate's Chief Operating Officer, and Corey Smee, who used to supervise Gordon, called Gordon to inform him that all of Gordon's services to Health Mate were terminated effective immediately. Mr. You read a termination letter to Gordon and asked him to return all access information for any and all accounts Gordon had created for Health Mate, Health Mate Sauna or Health Mate Wellness. Gordon never complied with this request. (*Id.* ¶¶ 27-30 & Exh. 5.)

Apparently unhappy with being terminated, Gordon immediately responded by threatening Plaintiff. Gordon stated:

- "I'm gonna turn everything the fuck off."
- "How about that?"
- "And how about this too?"
- "I'm gonna take down fucking Health Mate to the bones."
- "You realize how much keys [a manager under prior ownership of the company] gave me to the company? Do you understand?"
- "Does fucking Samick understand?"
- "You guys understand?" "You guys understand?"

---

[1] Mason worked with and for Gordon while Gordon provided services to Health Mate. Gordon compensated Mason directly. Health Mate did not ever make any payment to Mason for services she provided to Gordon. (*Id.* ¶ 26.)

- "You don't understand?"  "Ok."
- "Give me a week and let's see what fucking happens."

Gordon hung up the phone on Mr. You after making the foregoing threats. (*Id.* ¶¶ 31-32.)

## III. **Defendants Gordon and Mason Have Committed Trademark Infringement and Misappropriated Health Mate's Business.**

### A. **Misappropriation of Health Mate's Trade Secrets.**

While serving as a consultant for Health Mate, Gordon and Mason had full access to Pipedrive, a comprehensive customer relationship management software that Health Mate used as its primary customer database.  Pipedrive included, among other information, Health Mate's confidential customer names, addresses, telephone numbers, email addresses, and order histories for both saunas and sauna replacement parts.  At the time Gordon was terminated, Pipedrive included information for approximately two years of Health Mate's sales and for approximately 6,500 customers.  (*Id.* ¶¶ 36-37.)

The information in Pipedrive was and remains confidential and sensitive and constitutes Health Mate's trade secrets.  It has not been disclosed publicly.  Other than Health Mate employees, only Gordon and Mason had access to information in Pipedrive.  Health Mate authorized Defendants to have access to the information in Pipedrive only while Gordon was a consultant for Health Mate.  (*Id.* ¶¶ 38-39.)

While serving as a consultant, Health Mate informed Gordon he must maintain the confidentiality of information in Pipedrive.  Gordon and Mason also knew that they were permitted to have access to Health Mate's information in Pipedrive only while they had a business relationship with Health Mate.  Upon being terminated, Gordon and Mason knew that Health Mate did not authorize Defendants to use Health Mate's trade secrets, including its secret customer information in Pipedrive.  (*Id.* ¶¶ 40, 42; *see also* Declaration of Harvinder S. Anand, dated March 12, 2020 ("Anand Decl.") ¶¶ 4-5.)

-4-

Information in Pipedrive, including regarding Health Mate's customer needs and preferences, has significant economic value because it allows anyone who knowledge of the information to gain a distinct advantage through familiarity with Plaintiff's approximately 6,500 customers in the sauna industry.  Despite Health Mate's request on July 20, 2019, Gordon has not returned all access information for any and all accounts Gordon had created for Health Mate, Health Mate Sauna or Health Mate Wellness, including for Pipedrive.  (Smee Decl. ¶ 41.)

Gordon and Mason continue to retain all the trade secrets stored in Pipedrive at the time of Gordon was terminated.  (*Id.* ¶ 44.)

**B.     Defendants Have Used Information in Pipedrive to Sell Saunas Using Health Mate's Trade Name.**

While serving as a consultant for Health Mate, Gordon registered two email addresses that incorporate the HEALTH MATE Trademark and Health Mate's trade name: "healthmatesaunas@gmail.com" ("Infringing Email Address No. 1") and "Healthmatesaunaoffical@gmail.com" ("Infringing Email Address No. 2"), which purports to be Health Mate Sauna's "official" email address.  After being terminated on July 20, 2019, Gordon and Mason also knew that Health Mate did not authorize Defendants to use the HEALTH MATE Trademark, Health Mate's trade or corporate name, or any variation of the foregoing, including in Infringing Email Address No. 1 or Infringing Email Address No. 2.  (*Id.* ¶¶ 45-47.)

Defendants have engaged in unfair competition and illegally derived profits by misappropriating and using Plaintiff's trade secret customer information in Pipedrive to sell saunas to Health Mate's customers under the false guise of being affiliated or associated with Health Mate.  For example, a credit card transaction receipt acquired by Plaintiff shows that Gordon charged a customer's Visa card account ending in 5513 for $3,995 on November 18, 2019.  The sale was made under the name "Health Mate Infrared Sauna" and/or "HM Corporate Sales." "Garrett Gordon" was the "Cashier" for the sale.  Gordon used an email address

that incorporates Health Mate's trade name to process the credit card transaction ("healthmatesauna@gmail.com"), which is the same as Infringing Email Address No. 1, except that the "s" is omitted after "healthmatesauna." (*Id.* ¶¶ 35, 48-49, 51-54 & Exh. 6.)

Between November 25, 2019 and February 2, 2020, Gordon made eight more credit card sales in this same way, totaling $27,265. The credit card transaction receipts all state the sales were made under the name "Health Mate Infrared Sauna" and/or "HM Corporate Sales." "Garrett Gordon" was reported as the "Cashier" for each sale and Gordon made each sale while using email address "healthmatesauna@gmail.com" (*i.e.*, Infringing Email Address No. 1 with the "s" omitted). Given the high dollar amount of these sales, seven of the above transactions are strongly believed to involve the sale of a sauna and one (for $895 on November 25, 2019) is believed to be for the sale of replacement part(s). (*Id.* ¶¶ 35, 50-54 & Exhs. 7-14 & 37.)

Health Mate received credit card transaction receipts for all the above-described sales directly from Clover, a credit card processing company. The buyers' credit card statements also would reflect "Health Mate Infrared Sauna" or "HM Corporate Sales" as the merchant who sold the products they purchased. Gordon would not have identified the seller as "Health Mate Infrared Sauna" and/or "HM Corporate Sales" in credit card transactions unless he had identified himself as being affiliated or associated with Health Mate prior to consummating the sales. In so doing, Gordon created the false and fraudulent impression to customers that Defendants have some affiliation or relationship with Health Mate. (*Id.* ¶¶ 51-56 & Exhs. 6-14 & 37.)

Health Mate also strongly suspects that Gordon has been using Infringing Email Address No. 1 and/or Infringing Email Address No. 2 to communicate with and solicit customers. Defendants likely would send emails from an address that contains "Health Mate" in the name to make it appear to customers they are

-6-

dealing with Health Mate directly, not someone unaffiliated with the company. This is the reason that Gordon started using those email addresses in the first place. (*Id.* ¶¶ 57-58 & Exhs. 6-14 & 37.)

Health Mate is aware of two instances, after Gordon was terminated, of Defendant Mason contacting a former Health Mate customer to sell purported Health Mate replacement parts.  (*Id.* ¶ 57.)

**C.   Defendants Also Used Health Mate's Trademarks and Logo to Sell Parts on a Competing Website.**

Defendants also have misappropriated Health Mate's business and customers by selling replacement parts for Health Mate saunas while stealing its Trademarks, Logo, trade name, and trade dress.  Gordon owns and controls the domain "healthmateparts.com" (the "Infringing Domain") and operates the website www.healthmateparts.com (the "Infringing Website").  Prior to terminating Gordon, Health Mate authorized him to sell its company-certified replacement parts through its website located at www.healthmatesauna.com.  After being terminated, Defendants knew that Health Mate did not authorize Defendants to use the HEALTH MATE Trademark, the HEALTH MATE Logo, the Health Mate trade name, or any variation of the foregoing, to sell any products, including through the Infringing Website.  This is evidenced by, among other things, Gordon's threats to harm Health Mate on July 20, 2019.  (*Id.* ¶¶ 31, 35, 60-61.)

Without Health Mate's authorization, Defendants continued using a modified version Health Mate's actual Trademark and used Health Mate's trade name in advertising on the Infringing Website.  The infringing trademark modified Health Mate's genuine Trademark to add the words "Replacement Parts," but otherwise used the protected Trademark (*i.e.*, the word mark "HEALTH MATE"), including the same font as used in the Logo, in conjunction with the same distinctive red color used in the Logo (the "Infringing Trademark").  (*Id.* ¶¶ 62-65.)

The Infringing Website's homepage displayed an approximately 6-minute

video in which Gordon made false and fraudulent statements about Health Mate. Among other false statements, Gordon represented in the video that he had manufactured an "upgraded" version of Health Mate's power supply box and that Gordon's parts were superior to Health Mate's genuine replacement parts. Gordon's claim that he had manufactured superior replacement parts for Health Mate saunas was false and fraudulent because: (a) the purportedly "upgraded" power box in Gordon's video appeared visually to be identical to Health Mate's own power supply box; and (b) prior to being terminated on July 20, 2019, Gordon purchased Health Mate-certified power supply boxes, which Gordon passed off to customers as the purported "upgraded" parts.  (*Id.* ¶¶ 67-68.)

Defendant Gordon removed the false video from the Infringing Website with an "Under Construction" page.  However, the same video continues to appear on You Tube and is available at: https://www.youtube.com/watch?v=bNDwdVOm2gI.  The following claim appears below the video: "Health Mate Parts can upgrade your sauna with new parts and US based technical support.  Don't rely on poor service, call the experts at www.healthmateparts.com."  Accordingly, the harm to Health Mate from the false video and the Infringing Website is ongoing and continuous.  (*Id.* ¶¶ 68-69.)

Users who encountered the Infringing Website actually were confused and believed they were purchasing products directly from Health Mate.  Indeed, numerous customers contacted Health Mate after *not* receiving parts they ordered from Defendants.  Many customers stated they were "shocked" to learn they had not purchased their parts directly from Health Mate.  (*Id.* ¶¶ 72-78 & Exhs. 15-24.)

This confusion, mistake, and deception regarding the source of the Infringing Website's products and regarding any perceived affiliation between the Infringing Website and Health Mate resulted in Defendants diverting customers; misappropriating Health Mate's business; significantly harming Health Mate's reputation, goodwill, Trademarks, and Logo; and diluting the value of Health

-8-

1   Mate's Trademarks and Logo.  (*Id.* ¶¶ 71.)

2       In addition to stealing HEALTH MATE's Trademark and Logo, Defendants

3   intentionally took additional steps to mislead customers and misappropriate

4   business from Health Mate.  Among other things, Defendants (1) sent customers

5   invoices that included a Counterfeit Logo and Health Mate's actual business

6   address or customer service telephone number; (2) sent customers "confirmatory"

7   emails purporting to be from the email address "Health Mate Fulfillment

8   <support@healthmatesauna.com>," which actually belongs to Health Mate;

9   (3) included Health Mate's business address and customer service telephone

10  number in the "confirmatory" emails to customers; and (4) stole Health Mate's

11  trade dress in distributing products to customers.  (*Id.* ¶¶ 79-93 & Exhs. 15-30.)

12      Defendants have exploited Health Mate's goodwill and business reputation

13  by attracting users through their unauthorized use of Health Mate's trade name,

14  Trademarks, and Logo, and deceiving them into believing they were dealing

15  directly with Health Mate.  The harm to Health has been compounded significantly

16  by Defendants' failure to deliver products as promised to numerous customers,

17  who believed they were dealing directly with Health Mate. The Infringing

18  Website's bare-bones layout and appearance also diluted and tarnished Health

19  Mate's Trademark by negatively associating Health Mate with a low-quality

20  website whose purpose was to divert Health Mate's business.  (*Id.* ¶¶ 94-95.)

21      Even worse, Gordon made materially false and disparaging statements about

22  Health Mate and its employees on the Infringing Website to bolster sales of

23  purported replacement parts for Health Mate products, as part of Defendants'

24  concerted negative campaign against Health Mate.  For example, Gordon used the

25  Infringing Website to falsely tout himself as the "manufacturer [of] upgraded

26  Health Mate parts, engineered by USA technicians" and to falsely inform the

27  public that "Health Mate no longer has the ability to give you the technical support

28  you need or deserve to fix your sauna."  These two statements were false because

in truth and fact (a) on information and belief, Gordon actually sold genuine Health Mate replacement parts that Gordon passed off as purportedly superior parts; and (b) Health Mate possessed the ability to and in fact did provide technical support to customers who required repair of their saunas. (*Id.* ¶¶ 96-97.)

On or about October 28, 2019, Gordon learned that Health Mate intended to file suit against him for many of the acts described herein.  Knowing that the content on the Infringing Website was illegal, Gordon replaced all the false and fraudulent content with a single "landing page" that states the site is "Under Construction."  The "landing page" continues to appear as of the filing of this Application.  The bare-bones layout and appearance of the single webpage continue to dilute and tarnish Health Mate's Trademark by negatively associating Health Mate with a low-quality "website."  (*Id.* ¶¶ 98-100.)

Plaintiff authorized its attorneys to contact Defendants Gordon and Mason to engage in settlement discussions.  Those discussions were not successful.  Despite knowing the wrongfulness of their actions, Defendants have continued to illegally use the HEALTH MATE Trademarks and Logo and the Health Mate trade and corporate names, as shown by Defendants' recent sales from November 2019 through February 2020.  (*Id.* ¶¶ 99, 49-59, 101 & Exhs. 6-14 & 37.)

Defendants also continue to make false statements about Health Mate in the You Tube video available at: https://www.youtube.com/watch?v=bNDwdVOm2gI.  (*Id.* ¶¶ 68, 102.)

## IV.   **Defendants Have Harmed Health Mate by Causing Its Website to Crash and by Posting Numerous False Negative Reviews.**

On July 20, 2019, Gordon bragged that he had the "keys . . . to the company" and threatened that he was "gonna turn everything the fuck off." Gordon further threatened to "take down fucking Health Mate to the bones."  In the ensuing weeks, Health Mate experienced three unprecedented attacks on its website located at www.healthmatesauna.com, including an attack on August 14,

2019 that caused the site to crash for approximately 12 hours.  Health Mate strongly suspects Gordon, who possessed technical information about Health Mate's site and had the technical ability to launch such attacks, was responsible. No other person had threatened Health Mate at any time prior to the three website attacks.  (*Id.* ¶¶ 35, 103-108.)

Consistent with all the other intentional actions Defendants have taken to harm Health Mate, starting on July 24, 2019, a mere four days after Gordon threatened Health Mate, Defendants commenced a negative public campaign against Health Mate.  Defendants posted at least five false negative reviews on Yelp, including four reviews they ghost-wrote using fictitious "customer" names. The negative reviews falsely disparaged Health Mate and its current customer service team while praising its former customer team, *i.e.*, Defendants, without identifying them by name.  Recognizing the obvious falsity of the reviews, Yelp removed them.  (*Id.* ¶¶ 109-31 & Exhs. 31-36.)

## **ARGUMENT**

## I.   **Standards for Issuing a Temporary Restraining Order.**

A temporary restraining order "preserv[es] the status quo and prevent[s] irreparable harm" until a hearing can occur regarding whether a preliminary injunction should issue.  *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974).  "The standards for a temporary restraining order and a preliminary injunction are the same."  *Johnson v. Macy*, 145 F. Supp. 3d 907, 913 (C.D. Cal. 2015).

In order to obtain injunctive relief, a plaintiff must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent injunctive relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The Ninth Circuit recognizes a sliding scale of the factors, where "'serious questions going to the merits' and a balance of hardships that tips sharply towards

the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Plaintiff readily meets this standard. The wrongfulness of Defendants' conduct is clear. Defendants maliciously have executed a campaign to harm Health Mate and misappropriate its business and customers by unfairly and illegally stealing Health Mate's Trademarks, Logo, trade and business names, and trade secrets. The balance of hardships thus falls decisively in favor of the issuance of interim relief, and such relief would fully serve the public interest.

## II.   Plaintiff Is Entitled to an Immediate Restraining Order to Stop Defendants' Ongoing Violations of Law.

### A.   Plaintiff Is Likely to Succeed on the Merits of Its Trademark Infringement and Trademark Counterfeiting Claims.

#### 1.   *Applicable Legal Standards.*

Plaintiff's first two claims for relief allege Federal Trademark Infringement and Federal Trademark Counterfeiting under § 32 of the Lanham Act, 15 U.S.C. §§ 1114(1)(a) & (b). The test for these two claims is very similar.

"The Lanham Act was intended to make actionable the deceptive and misleading use of marks, and to protect persons engaged in . . . commerce against unfair competition." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 (2003) (internal quotations omitted). Thus, "the courts have uniformly held that common law and statutory trademark infringement are merely specific aspects of unfair competition." *DC Comics v. Towle*, 989 F. Supp. 2d 948, 960 (C.D. Cal. 2013). "To sustain a claim for trademark infringement" under § 32 the Lanham Act, 15 U.S.C. § 1114(1), Plaintiff must show "(1) that [it has] valid trademark rights; and (2) that Defendants' use of a similar mark is likely to cause confusion." *Applied Info. Scis. Corp. v. eBay, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007).

"Under the Lanham Act, the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks." *DC Comics*, 989 F. Supp. 2d at 960; *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992) ("The core element of trademark infringement is the likelihood of confusion, *i.e.*, whether the similarity of the marks is likely to confuse customers about the source of the products.").

"Although assessing likelihood of confusion under [an] eight-factor test[2] is generally a factual determination, in cases involving counterfeit marks, it is unnecessary to perform the step-by-step examination . . . because counterfeit marks are inherently confusing." *E.g., Nestlé USA, Inc. v. Gunther Grant, Inc.*, 2014 U.S. Dist. LEXIS 198812, at *22 (C.D. Cal. May 13, 2014) (internal quotations omitted); *see also Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F.Supp.2d 284, 287 (S.D.N.Y. 2003) ("[C]ounterfeits by their very nature, cause confusion").

## 2. *Plaintiff Owns the Protectable HEALTH MATE Marks.*

Plaintiff is the federally registered owner of all right, title, and interest in the HEALTH MATE Marks and has been using those Marks for almost 27 years in connection with the marketing and sale of saunas and sauna replacement parts. (Smee Decl. ¶¶ 6-10, 13-14.)  After Health Mate terminated its relationship with Gordon, Defendants used the Infringing Trademark and Counterfeit Logo to sell the very same products, saunas and sauna replacement parts, in direct competition with Plaintiff and to misappropriate its business.  (*Id.* ¶¶ 62-93.)

Plaintiff's federal registrations of the HEALTH MATE Marks are *prima facie* evidence of the validity of the Marks, as well as of Plaintiff's exclusive right

---

2    Courts analyze the following factors, known as the *Sleekcraft* test, in determining the likelihood of confusion: (1) strength of plaintiff's mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and the (8) likelihood of expansion of the product lines. *Dr. Seuss Enters. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1404 (9th Cir. 1997).

to use the Marks in commerce in connection with the goods specified in the registrations.  *Brookfield Commc'ns., Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999) (explaining "registration of a mark on the Principal Register in the Patent and Trademark Office constitutes *prima facie* evidence of the validity  of the registered mark and of [the registrant's] exclusive right to use the mark on the goods and services specified in the registration"); *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005) ("When a plaintiff pursues a trademark action involving a properly registered mark . . . the burden of proving that the mark is generic rests upon the defendant.").

> ### 3. <u>Consumers Are Likely to Be Confused as to the Source of Defendants' Products.</u>

A counterfeit mark is "(1) a non-genuine mark identical to the registered, genuine mark of another, where (2) the genuine mark was registered for use on the same goods to which the infringer applied the mark." *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 946 (9th Cir. 2011).

Defendants plainly are using counterfeits of Plaintiff's registered HEALTH MATE Marks.  As a simple visual comparison confirms, Defendants have copied and incorporated Plaintiff's "HEALTH MATE" Marks into their Infringing Trademark (*i.e.*, "Health Mate Replacement Parts") and Counterfeit Logo.  (Smee Decl. ¶¶ 62-65, 79-82 & Exhs. 15-30.)  Defendants also have adopted and included "Health Mate" into their emails, invoices, and packaging to customers, all to sell the very same products as Plaintiff—saunas and sauna replacement parts—without Plaintiff's permission.  (*Id.* ¶¶ 83-93 & Exhs. 6-30 & 37.)  Consistent with Gordon's malicious threat to "take down fucking Health Mate to the bones," Defendants simply decided to intentionally steal Plaintiff's valuable intellectual property and entire brand, including the Health Mate trade and corporate names, to misappropriate Health Mate's customers and business.

Courts consistently have held that "[i]n light of the virtual identity of marks,

if they were used with identical products or services likelihood of confusion would follow as a matter of course."  *Louis Vuitton Malletier, S.A.*, 658 F.3d at 945; *Brookfield Commc'ns, Inc.*, 174 F.3d at 1056 (same).  It is not necessary to examine the *Sleekcraft* factors because counterfeit marks are "inherently confusing."  *Nestlé USA, Inc.*, 2014 U.S. Dist. LEXIS 198812, at *22; *Hand & Nail Harmony, Inc. v. ABC Nail & Spa Prods.*, 2017 U.S. Dist. LEXIS 59970, at *24 (C.D. Cal. Apr. 19, 2017).  "[C]onfusing the customer is the whole purpose of creating counterfeit goods."  *Gucci Am., Inc.*, 286 F.Supp.2d at 287.

Although "[n]either actual confusion nor intent is necessary to a finding of *likelihood* of confusion," *see Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988) (emphasis in original), Defendants' actions undeniably have caused actual confusion because numerous customers who purchased products from Defendants informed Plaintiff they believed that they were dealing directly with Health Mate (Smee Decl. ¶¶ 70-78).  *DC Comics v. Towle*, 989 F. Supp. 2d 948, 960-61 (C.D. Cal. 2013) (explaining that even the "innocently created" "likelihood of public confusion . . . will warrant injunctive relief against unfair competition"), *aff'd* 802 F.3d 1012 (9th Cir. 2015).

       *4.*     *Plaintiff Is Likely to Succeed on the Merits of Its California Common Law Trademark Infringement and Unfair Business Practices Claims.*

Plaintiff's seventh and ninth claims for relief allege California Common Law Trademark Infringement and California Unfair Competition.  The Ninth Circuit "has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims under the Lanham Act."  *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994); *see also Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1221 (9th Cir. 2012) (explaining claims for trademark infringement and competition under California law are "subject to the

same legal standards" as Lanham Act claims); *Century 21 Real Estate, LLC v. Ramron Enters.*, 2015 U.S. Dist. LEXIS 15480, at *15 (E.D. Cal. Feb. 9, 2015) ("[A] plaintiff who establishes claims under the [Lanham] Act also satisfies the elements for claims of common law trademark infringement and unfair competition under California . . . state laws.").  Accordingly, Plaintiff is likely to succeed on the merits of its California Common Law Trademark Infringement and California Unfair Competition claims.

> **B.     Plaintiff Is Likely to Succeed on the Merits of Its Claim for Federal Trademark and Trade Name Infringement, Federal False Designation of Origin, and Unfair Competition.**

Plaintiff's third claim for relief, for Federal Trademark and Trade Name Infringement, False Designation of Origin, and Unfair Competition, is brought under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for Defendants' unauthorized use of the HEALTH MATE Trademarks, for infringement of Health Mate's trade name and trade dress, and for unfair competition.

"This section [1125(a)(1)], unlike certain other Lanham provisions, protects against infringement of unregistered marks and trade dress as well as registered marks.  The elements of a cause of action under this provision . . . do not include registration."  *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 926 (9th Cir. 2014) (internal quotations and citations omitted); *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (explaining "Section 43(a) prohibits a broader range of practices than does § 32 [codified at 15 U.S.C. § 1114(1)], which applies to registered marks"); *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1036 (9th Cir. 2005) (explaining § 43 also proscribes "the use of false designations of origin, false descriptions, and false representations in the advertising and sale of goods and services").

Because "trade names cannot be registered and are therefore not protected under 15 U.S.C. § 1114 . . . actions for trade name infringement can be brought

under section 43(a)." *Accuride International, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534 (9th Cir. 1989) (citation omitted).  "Trade name infringement also is part of the larger tort of unfair competition and it is based on considerations similar to trademark infringement." *New W. Corp. v. NYM Co.*, 595 F.2d 1194, 1201 (9th Cir. 1979).  "The terms 'trade name' and 'commercial name' mean any name used by a person to identify his or her business or vocation."  15 U.S.C. § 1127.

To establish a claim for trademark infringement or false designation of origin under § 43(a)(1)(A), 15 U.S.C. § 1125(a)(1)(A), a plaintiff must prove that the defendant (1) used in commerce, (2) any word, false designation of origin, false or misleading description, or representation of fact, that (3) is likely to cause confusion or mistake, or to deceive, as to sponsorship, affiliation, or the origin of the goods or services in question.  *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902 (9th Cir. 2007); *see also Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 917 (9th Cir. 1980) (explaining § 43(a)(1)(A) "preclude[s] the use of another's trademark in a manner likely to confuse the public about the origin of goods").  "Trademark and trade name infringement, or unfair competition, preclude one from using another's distinctive mark or name if it will cause a likelihood of confusion or deception as to the origin of the goods." *New W. Corp.*, 595 F.2d at 1201.

Given the similarity between claims under Sections 43 and 32 of the Lanham Act, the Ninth Circuit has explained that "[w]hether we call the violation infringement, unfair competition or false designation of origin, the test is identical - is there a 'likelihood of confusion?'  *New W. Corp.*, 595 F.2d at 1201. Accordingly, courts analyze claims under the two sections together.  *E.g., JL Beverages Co. LLC v. Jim Beam Brands*, 828 F.3d 1098, 1104-05 (9th Cir. 2016) (analyzing false-designation-of-origin and trademark claims together).

For the same reasons discussed above, Defendants stole and used the Health Mate Logo, and indeed Health Mate's entire brand, including the Health Mate

trade and corporate names and Health Mate's trade dress, to unlawfully sell products to customers.  Numerous customers actually were confused into believing they were dealing directly with Health Mate.  Plaintiff is likely to succeed on its third claim for relief.

### C.   Plaintiff Is Likely to Succeed on the Merits of Its Federal Trademark Dilution Claim.

Plaintiff's fourth claim for relief, for Federal Trademark Dilution, is brought under 15 U.S.C. § 1125(c)(1).  The Trademark Dilution Revision Act (the "TDRA") provides:

> [T]he owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of *a mark or trade name* in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1) (emphasis added).

 A party must prove "(1) that its mark is famous and distinctive, (2) that defendant began using its mark in commerce (3) after plaintiff's mark became famous and distinctive, and (4) that defendant's mark is likely to dilute plaintiff's mark."[3]  *Lions Gate Entm't, Inc. v. TD Ameritrade Holding Corp.*, 2016 U.S. Dist. LEXIS 101234, at *7 (C.D. Cal. Aug. 1, 2016).

An "obvious case" of actual dilution is "where the junior and senior marks are identical."  *Moseley v. V Secret Catalogue*, 537 U.S. 418, 434 (2003).  This test is met because Defendants plainly have incorporated the Health Mate Trademarks

---

[3]   "Dilution by blurring" is defined as "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."  15 U.S.C. § 1125(c)(2)(B).  "Dilution by tarnishment" is defined as "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark."  *Id.* § 1125(c)(2)(C).

-18-

into the Infringing Trademark and Counterfeit Logo with very slight variations to mislead customers into believing they were dealing with Health Mate directly.

"Blurring occurs when a defendant uses a plaintiff's trademark to identify the defendant's goods or services, creating the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product.  The theory of dilution by blurring thus protects the benefits that flow from a sharp and distinct connection between one mark and one product."  *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1037 (9th Cir. 2007); *Apple, Inc. v. Samsung Elecs. Co.*, 920 F. Supp. 2d 1079, 1097 (N.D. Cal. 2013) ("Dilution refers to the whittling away of the value of a trademark when it's used to identify different products.").

The facts here are the same as in *Horphag,* in which the Ninth Circuit upheld dilution by blurring: "numerous consumers who contacted [Plaintiff] learned, after purchasing [Defendants'] product[s], that the product[s] they purchased [were] not [Plaintiff's Health Mate products].  . . . This testimony represents evidence that [Defendants'] actions have lessened the ability of the mark [HEALTH MATE] to uniquely identify [Plaintiff's] product[s]."  *Horphag Research Ltd.*, 475 F.3d at 1037*; see also Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1090-92 (9th Cir. 2010) (affirming summary judgment for plaintiff, holder of the "Visa" credit card mark, based on dilution by blurring because defendant's use of "eVisa" mark "weaken[ed] the [protected] mark's ability to bring to mind plaintiff's services").

Defendants' continued use of the Infringing Domain also dilutes Health Mate's Marks.  *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1327 (9th Cir. 1998) (holding "[the defendant's] registration of [the plaintiff's] trademarks as [the defendant's] domain names on the Internet diluted those marks" because the "[the defendant's] use of [of the domain] also puts [the plaintiff's] name and reputation at his mercy" and "potential customers of [the plaintiff] will be discouraged if they cannot find its web page").

**PLAINTIFF'S *EX PARTE* APPLICATION FOR TRO AND OSC RE: PI**

### D.   Plaintiff Is Likely to Succeed on the Merits of Its Cyberpiracy Claim.

Plaintiff's fifth claim for relief alleges Defendants committed cyberpiracy under the Anti-Cybersquatting Consumer Protection Act ("ACPA").  The ACPA "establishes civil liability for 'cyberpiracy' where a plaintiff proves that (1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted 'with bad faith intent to profit from that mark.'"  *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218-19 (9th Cir. 2010) (quoting 15 U.S.C. § 1125(d)).  These elements are satisfied here.

First, after Defendant Gordon was terminated, both Defendants Gordon and Mason used the Infringing Domain[4] (*i.e.*, healthmateparts.com) and the Infringing Website (*i.e.*, www.healthmateparts.com) to sell purported replacement parts for Health Mate saunas.  Even though Defendant Gordon initially registered the Infringing Domain while he served as a consultant (Smee Decl. ¶ 60), Defendants' continued use of the Infringing Domain after termination satisfies the first element of cyberpiracy.  In a case involving very similar facts, the Ninth Circuit explained that "use alone is enough to support [a claim for cyberpiracy], even in the absence of violative registration or trafficking," where the defendant initially registered the domain while previously working with the plaintiff.  *DSPT Int'l, Inc.*, 624 F.3d at 1219.  This is because "[the defendant] could not have reasonably believed that he could lawfully use [the infringing domain] when he no longer worked for [the plaintiff]."  *Id.* at 1220.  (*See also* Smee Decl. ¶ 61.)

Second, the Infringing Domain incorporates Health Mate's registered "Health Mate" Marks, making the domain name identical or confusingly similar to

---

[4]   "A domain name typically consists of a top level domain extension, such as .com, .org, or .net, and a second level domain name, such as pepsi in pepsi.com." *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 783 (8th Cir. 2004).  Accordingly, the Infringing Domain is a "domain name" under the ACPA.

consumers.  "The question under the ACPA is not whether the domain names which [the defendant] registered are likely to be confused with a plaintiff's *domain name*, but whether they are identical or confusingly similar to a plaintiff's *mark*.  It is the challenged domain name and the plaintiff's mark which are to be compared." *Coca-Cola Co.*, 382 F.3d at 783 (emphases in original).  This test is met because numerous consumers who purchased products from Defendants through the Infringing Domain told Plaintiff they were actually confused, believing they were dealing directly with Health Mate.  *Id.* at 784 (explaining "we see no error in the district court's findings that the . . . domains (my-washingtonpost[.com], mymcdonalds[.com], and drinkcoke[.com]) are confusingly similar to the Washington Post, Coke, and McDonald's marks"); *see also Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 582 (E.D. Pa. 2002) (holding that plaintiff who owned the Louis Vuitton mark was entitled to default judgment on an ACPA claim based on defendant's use of the domain name www.LouisVuitton-replicas.com).

Third, after being terminated, Defendants continued using the Infringing Domain with undeniable bad faith intent to profit from the false association with Health Mate's entire brand and its Trademarks.  *DSPT Int'l, Inc.*, 624 F.3d at 1220 ("Evidence of bad faith may arise well after registration of the domain name.").  The ACPA enumerates nine non-exclusive factors for a court to consider in evaluating a defendant's bad faith.  15 U.S.C. § 1125(d).  An analysis of these factors strongly indicates Defendants' bad faith: (1) Defendants have "no trademark or other intellectual property rights" in the Infringing Domain name; (2) The Infringing Domain name does not "consist[] of the legal name of" either Defendant "or a name that is otherwise commonly used to identify" either Defendant; (3) Defendants "could not have reasonably believed that [they] could lawfully use [the Infringing Domain] when [they] no longer" had and business relationship with Health Mate, *see DSPT Int'l, Inc.*, 624 F.3d at 1220;

(4) Defendants did not make "bona fide noncommercial or fair use of" the Health Mate "mark[s] in a site accessible under the domain name"; (5) Defendants' use of the Health Mate Marks in the Infringing Domain name demonstrates their intent to divert consumers from Health Mate for commercial gain by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; and (6) Health Mate Marks are fanciful, distinctive and famous.[5] *See generally*, 15 U.S.C. § 1125(d)(1)(B)(i).

All of these factors establish Defendants' clear bad faith.  Defendants did not attempt to compete with Health Mate by setting up a domain and website in their own names.  Rather, Defendants used the Infringing Domain after Defendant Gordon's termination to obtain financial benefits by trading upon Health Mate's valuable Marks and trade name.  Combined with the other overwhelming evidence of Defendants' bad faith, including Defendant Gordon's threats and Defendants' malicious false negative reviews, Plaintiff has established it is likely to succeed on the cyberpiracy claim.

**E.   Plaintiff Is Likely to Succeed on the Merits of Its Federal and State Claims for Trade Secret Misappropriation.**

Plaintiff's sixth and eighth claims for relief are for federal and California state trade secret misappropriation.  The federal Defend Trade Secrets Act of 2016 ("DTSA") provides civil plaintiffs with a remedy for misappropriation of trade secrets and closely hews to the Uniform Trade Secrets Act adopted by nearly all 50 states, including California.  Because the legal requirements for Plaintiff's sixth

---

[5]   Plaintiff's Marks are fanciful, distinctive and famous.  Registration of the Marks clearly evidences their distinctiveness.  *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1199 (9th Cir. 2009) ("There can be no serious dispute with the principle that a federal trademark registration of a particular mark supports the distinctiveness of that mark.").  Moreover, "'proof of substantially exclusive and continuous use [of] . . . a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made' can serve as *prima facie* evidence of distinctiveness."  *Art Attacks Ink, LLC v. MGA Entertainment, Inc.*, 581 F.3d 1138, 1146 (9th Cir. 2009) (citing 15 U.S.C. § 1052(f)).

and eighth claims are virtually identical, they will be discussed together.

To succeed on their DTSA claim, Plaintiff must show: "(1) the existence and ownership of a trade secret, and (2) misappropriation of the trade secret." *Mackintosh v. Lyft, Inc.*, 2019 U.S. Dist. LEXIS 190252, at *16 (E.D. Cal. Oct. 31, 2019); *Sun Distrib. Co., LLC v. Corbett*, 2018 U.S. Dist. LEXIS 176224, at *6 (S.D. Cal. Oct. 12, 2018) (same). A claim under California's Uniform Trade Secret Act ("CUTSA") has "substantially similar elements." *Corbett*, 2018 U.S. Dist. LEXIS 176224, at *6; *see also Mackintosh*, 2019 U.S. Dist. LEXIS 190252, at *16 (same).

### 1. *Plaintiff's Pipedrive Customer Resource Management Software Contains Confidential Customer Trade Secrets.*

The DTSA defines "trade secret" as "all forms and types of financial, business, . . . technical [or] economic . . . information, including:"

> plans, compilations, . . . formulas, . . . methods, techniques, processes, procedures, programs, or codes . . . whether or how stored, compiled, or memorialized . . . if . . . the owner thereof has taken reasonable measures to keep such information secret; and . . . the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). The CUTSA's definition of "trade secret" is the same. *Corbett*, 2018 U.S. Dist. LEXIS 176224, at *7.

Pipedrive, Plaintiff's customer database, includes, among other information, Plaintiff's confidential customer names, addresses, telephone numbers, email addresses, and order histories for sauna replacement parts. Pipedrive included this information for approximately two years of sales and for approximately 6,500 customers when Gordon was terminated. The information in Pipedrive, which was password-protected, has not been disclosed publicly. Other than Health Mate

-23-

employees, only Defendants had access to information in Pipedrive.[6]  (Smee Decl. ¶¶ 37-40.)

Health Mate permitted Gordon and Mason to have access to its customer information in Pipedrive only while Gordon was a consultant.  Information regarding Health Mate's customer needs and preferences has significant economic value because it permits anyone with this information to gain a distinct advantage through familiarity with Plaintiff's approximately 6,500 customers in the sauna industry, including prospective customer lists with contact information, customer need information, proprietary sales information, and proprietary price and rate information.  (Smee Decl. ¶¶ 36-44.)

The information in Pipedrive unquestionably constitutes "trade secrets" entitled to protection.  *E.g., MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (affirming as trade secret a "valuable collection of data assembled over many years that allows [plaintiff] to tailor its service contracts and pricing to the unique needs of its customers"); *Brocade Communs. Sys. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1214 (N.D. Cal. 2012) (reiterating that "confidential customer-related information including customer lists and contact information, pricing guidelines, historical purchasing information, and customers' business needs/preferences" is the "type of information [that] is routinely given trade secret protection") (citations omitted).

Plaintiff enjoys a competitive edge and derives independent economic value from its trade secret customer database not being known by other market participants.  Plaintiff used extensive efforts and incurred expenses to develop the

---

[6]   Plaintiff took "reasonable measures to keep such information secret." 18 U.S.C. § 1839(3).  Among other things, Plaintiff required Defendants and all employees with access to Pipedrive to maintain confidentiality of the information in Pipedrive.  *GSI Tech., Inc. v. United Memories, Inc.*, 2015 WL 1802616, at *4 (N.D. Cal. Apr. 20, 2015) (finding "reasonable measures to maintain the confidentiality" of trade secrets where plaintiff required all persons with access to trade secret information to take "all reasonable steps to prevent unauthorized disclosure or use of [plaintiff's] confidential information").

trade secret information that Defendants have misappropriated.  (Smee Decl. ¶ 41.) *See MAI Sys. Corp.*, 991 F.2d at 521 (explaining plaintiff's "Customer Database has potential economic value because it allows a competitor . . . to direct its sales efforts to those potential customers that are already using the [the plaintiff's product]"); *A10 Networks, Inc.*, 873 F. Supp. 2d at 1214  (explaining information about customers' needs and preferences "has potential or actual value from not being generally known to the public: information about customers' preferences can aid in securing and retaining their business").

> 2.     *Defendants Have Misappropriated Plaintiff's Trade Secrets by Retaining and Using the Information in Pipedrive.*

Under the DTSA, "misappropriation" includes the "*acquisition* of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A) (emphasis added). Misappropriation also includes the "disclosure or *use* of a trade secret of another," without consent, by someone who (1) "used improper means to acquire knowledge of the trade secret"; or (2) "at the time of disclosure or use, knew or had reason to know" that the trade secret was derived by improper means, was "acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret," or was obtained by a person who owed a duty to the person seeking relief to maintain the secrecy of, or limit the use of, the trade secret.  *Id.* § 1839(5) (emphasis added).  "Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  *Id.* § 1839(6).

The "DTSA contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use."  *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, 2017 U.S. Dist. LEXIS 62109, at *9 (N.D. Cal. Apr. 24, 2017) (citing 18 U.S.C. § 1839(5)); *see also Mackintosh*, 2019 U.S. Dist. LEXIS 190252, at *17 (same). The definition of misappropriation under the DTSA and CUTSA is "nearly

identical." *Corbett*, 2018 U.S. Dist. LEXIS 176224, at *12.  Here, Defendants misappropriated Plaintiff's trade secrets through both "acquisition" and "use."

Because "acquisition" is not defined under the DTSA (or the CUTSA), one court has analyzed and applied its plain meaning definition in a case with similar facts and the same issue present here:

> Black's Law Dictionary defines "acquisition" as "the gaining of possession or control over something."  Acquisition, Black's Law Dictionary (10th ed. 2014).  "Possession," in turn, is defined as "the fact of having or holding property in one's power; the exercise of dominion over property"; "the right under which one may exercise control over something to the exclusion of all others"; or "the detention or use of a physical thing with the intent to hold it as one's own."  Possession, Black's Law Dictionary (10th ed. 2014).  And "control" is "the power or authority to manage, direct, or oversee."  Control, Black's Law Dictionary (10th ed. 2014).

*AUA Private Equity Partners, LLC v. Soto*, 2018 U.S. Dist. LEXIS 58356, at *15 (S.D.N.Y. Apr. 5, 2018).  Applying this definition, the trade secrets in Pipedrive belong to Plaintiff because they "were controlled by [Plaintiff] and were meant to remain at all times within [Plaintiff's] possession and control."  *Id.* at *16-17.  Put another way, Defendants did not *"acquire"* the information in Pipedrive by merely having *access* to it prior to Plaintiff terminating its relationship with Defendant Gordon.  *Id.* at *19 (rejecting defendant's argument "acquisition of the trade secrets was proper because they had been provided to him by his employer during the course of his employment").

"Courts evaluating claims for misappropriation of trade secrets under the various state UTSAs that define 'misappropriation' in terms nearly identical to the DTSA have found that liability attaches to employees who . . . abscond with their employers' trade secrets, even in the absence of any subsequent use or disclosure of the information."  *Id.* at *17-20 (collecting cases).  Thus, even if Defendants did

-26-

not use Plaintiff's trade secrets (which is highly unlikely), by retaining Plaintiff's trade secrets in Pipedrive without the continued authorization of Plaintiff and by not returning all the information to Plaintiff as requested (Anand Decl. ¶¶ 4-5), Defendants misappropriated the trade secrets by "acquisition" under the DTSA and CUTSA.  *Id.* at *20 ("If the employee takes trade secret materials with him at the time of his departure from employment, he has acquired the trade secrets, 'by improper means.'") (internal quotations and citation omitted); *see also First Command Fin. Planning, Inc. v. Velez*, 2017 U.S. Dist. LEXIS 221757, *17 & n.4 (N.D. Texas May 8, 2017) (holding defendant's "retention of [trade secret] information, even if he may be social acquaintances with some of the clients, still satisfies the definition of misappropriation"); *H.Q. Milton, Inc. v. Webster*, 2017 U.S. Dist. LEXIS 193646, at *9 (N.D. Cal. Nov. 22, 2017) (granting temporary restraining order where defendant "was able to freely access [trade secret] information even though he was an independent contractor during his time at [the plaintiff]"); *Excelligence Learning Corp. v. Oriental Trading Co.*, 2004 U.S. Dist. LEXIS 30370, at *8 (N.D. Cal. Dec. 20, 2004) ("[T]he [CUTSA] does preclude former employees from using trade secrets during such competition, even secrets that have not been reduced to writing and are carried solely in the employee's mind.").

Defendants also misappropriated trade secrets by "using" them.  Defendants have sold expensive products totaling at least $31,260 while using the Health Mate trade and corporate names.  (Smee Decl. ¶¶ 48-59.)  Given all the other evidence of Defendants' wholesale misappropriation of Health Mate's entire brand, and that prior to being terminated by Health Mate, Gordon's experience for five years was in the sauna industry, the most reasonable inference is that Defendants sold saunas and that they "used" Plaintiff's trade secrets in Pipedrive to make those sales. *Corbett*, 2018 U.S. Dist. LEXIS 176224, at *15 (finding "allegation based on 'information and belief'" was "plausibly pled based on the evidence").  Indeed, the

evidence establishes that Defendants must have told the customers who made those large purchases that they were dealing with Health Mate directly because Health Mate appears as the merchant who processed each of the seven credit card transaction receipts.  (*Id.*)  It therefore is natural to further conclude that Defendants initiated the transactions by reaching out to Health Mate customers, whose information is in Pipedrive, and that those customers were willing to make large purchases believing they were dealing with Health Mate, a company they purchased from before and trusted, rather than an unknown and unproven individual such as Gordon.  (Smee Decl. ¶¶ 56-59.)

Aside from the above, the evidence overwhelmingly also establishes that Defendant Gordon maliciously threatened Health Mate when he was terminated, that Defendants have misappropriated Health Mate's Trademarks, Logo, and corporate and trade names, and that Defendants engaged in a vicious public campaign to harm Health Mate with false "reviews."  As other courts have concluded, "[i]n sum, through a combination of direct and circumstantial evidence," Plaintiff has met its burden of establishing Defendants used Plaintiff's trade secret information through improper means:

> [M]isappropriation and misuse can rarely be proved by convincing direct evidence. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences . . . that it is more probable than not that what plaintiffs allege happened did in fact take place.

*Corbett*, 2018 U.S. Dist. LEXIS 176224, at *14-15; *see also UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007) (same); *Q-Co Indus., Inc. v. Hoffman*, 625 F. Supp. 608, 618 (S.D.N.Y. 1985) (same); *MAI Sys. Corp.*, 991 F.2d at 521 (explaining "misappropriation occurs if information from a customer database is used to *solicit* customers") (emphasis in original).

**PLAINTIFF'S *EX PARTE* APPLICATION FOR TRO AND OSC RE: PI**

**III.** **Defendants Have Caused and Will Continue to Cause Irreparable Harm to Plaintiff If Injunctive Relief Is Not Granted.**

    **A.** **The Court Has Authority to Enjoin Each of Defendants' Violations.**

"Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement.  It is the remedy provided by federal and state trademark infringement statutes.  In cases where the infringing use is for a similar [product], broad injunctions are especially appropriate." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180-81 (9th Cir. 1988).

"For claims of cyberpiracy, 15 U.S.C. § 1125(d) expressly provides that in a civil action involving the 'use of a domain name' a court may order 'the transfer of the domain name to the owner of the mark.'" *Smith v. Guerilla Union, Inc.*, 2019 U.S. Dist. LEXIS 60309, at *8 (C.D. Cal. Apr. 18, 2019) (quoting 15 U.S.C. § 1125(d)(1)(C)).

More expansively, "district courts possess broad authority under the Lanham Act 'to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable,' including explicit authority to enjoin violations of § 1125 (*i.e.*, conduct likely to cause confusion among the public)." *EarthGrains Baking Cos. v. Sycamore*, 721 Fed. Appx. 736, 750 (10th Cir. 2017) (quoting 15 U.S.C. § 1116(a)) (unpublished).  The DTSA also expressly authorizes the issuance of injunctive relief "with respect to the misappropriation of a trade secret."  18 U.S.C. § 1836(b)(3)(A); *see also* Cal. Civ. Code § 3426.2(a) (providing "[a]ctual or threatened misappropriation may be enjoined").

    **B.** **A Temporary Restraining Order Is Necessary.**

A restraining order is warranted to remedy Defendants' clear violations of law.  Customers have been confused and deceived, Health Mate has lost business, and its brand and goodwill have been significantly harmed, especially because

Defendants failed to deliver products to customers as promised after illegally adopting Health Mate's Trademarks and trade name.  Defendants' flagrant theft of Plaintiff's Trademarks, its Logo, and indeed its entire brand while misappropriating Health Mate's customers and business will continue to cause irreparable harm absent immediate injunctive relief.  There is no adequate remedy at law that will compensate Plaintiff for these injuries.  *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt.*, Inc., 736 F.3d 1239, 1250 (9th Cir. 2013) ("Evidence of loss of control over business reputation and damage to goodwill constitutes irreparable harm."); *Nestlé USA, Inc.*, 2014 U.S. Dist. LEXIS 198812, at *52 (explaining "the injury caused by the presence of infringing products in the market—such as lost profits and customers, as well as the damage to the trademark holder's goodwill and business reputation such products cause—will often constitute irreparable injury"); *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1084 (C.D. Cal. 2012) ("If an injunction were not granted, Plaintiff would suffer irreparable injury from the ongoing damages to its goodwill and diversion of customers to counterfeit services."); *Toyo Tire & Rubber Co. v. Kabusikiki Kaisha Tokyo Nihoon Rubber Corp.*, 2015 U.S. Dist. LEXIS 146294, at *10 (D. Nev. Oct. 26, 2015) (finding "sufficient facts to support an inference of irreparable harm" given the defendant "ha[d] merely piggy-backed off of [plaintiff's] success").  "In cases where the infringing use is for a similar [product], broad injunctions are especially appropriate."  *Century 21 Real Estate Corp.*, 846 F.2d at 1180-81.

Additionally, through ongoing unauthorized use of the Infringing Domain, Defendants have committed cyberpiracy, which also continues to cause irreparable injury.  *Brookfield Communs., Inc.*, 174 F.3d at 1066-67 (reversing district court and ordering it to enter preliminary injunction because "[w]hen a firm uses a competitor's trademark in the domain name of its web site, users are likely to be confused as to its source or sponsorship. . . .  These forms of confusion are exactly what the trademark laws are designed to prevent."); *Super-Krete Int'l, Inc. v.*

1   *Sadleir*, 712 F. Supp. 2d 1023, 1037 (C.D. Cal. 2010) ("Plaintiff has demonstrated

2   irreparable injury based on the threatened loss of prospective customers who would

3   be diverted away from its website should it be unable to gain control over the

4   domain name.").

5          The Court therefore should order Defendant Gordon to transfer the

6   Infringing Domain to Health Mate.  *E.g., Smith*, 2019 U.S. Dist. LEXIS 60309, at

7   ** 8-9 (ordering defendant to transfer infringing domain); *Twitch Interactive, Inc.*

8   *v. Johnston*, 2018 U.S. Dist. LEXIS 184300, at *39, (N.D. Cal. Jan. 22, 2018)

9   (explaining "[the plaintiff] is entitled to transfer and ownership of the three

10  infringing domain names that are identical to or confusingly similar to [the

11  plaintiff's trademark").  As in *Twitch*, the Court also should enjoin Defendants

12  "from registering domain names that include the [Plaintiff's trade name] or any

13  confusingly similar word."  *Id.*

14         Additionally, the Court should order Defendant Gordon to transfer control of

15  Infringing Email Address No. 1 and Infringing Email Address No. 2 to Plaintiff.

16  Defendant Gordon has no legitimate reason to have those email addresses, and any

17  use of either account by Defendants—whether to receive, send, or forward

18  emails—would likely cause customer confusion, which is a violation of 15 U.S.C.

19  § 1125(a).  *New W. Corp.*, 595 F.2d at 1201 ("Trademark and trade name

20  infringement, or unfair competition, preclude one from using another's distinctive

21  mark or name if it will cause a likelihood of confusion or deception as to the origin

22  of the goods."); *Jack Russell Terrier Network*, 407 F.3d at 1036 (explaining

23  § 1125(a) proscribes "the use of false designations of origin [or] false

24  descriptions").

25         The Court is permitted to grant in injunction "to prevent a violation under"

26  § 1125(a).  15 U.S.C. § 1116(a).  The Court therefore should require Defendant

27  Gordon to transfer control of the Infringing Email Address No. 1 and Infringing

28  Email Address No. 2 to Plaintiff.  *Smith*, 2019 U.S. Dist. LEXIS 60309, at ** 2-3,

1  9-10 (ordering defendant, pursuant to § 1116(a), to transfer to plaintiff "social

2  media accounts using the [plaintiff's] Marks [which included "Rock the Bells"],

3  including the Twitter handle @rockthebells, the "Rock the Bells Festival"

4  Facebook account, and the "Rock the Bells" MySpace account"); *see also* 28

5  U.S.C. § 1651(a) (courts may "may issue all writs necessary or appropriate in aid

6  of their respective jurisdictions and agreeable to the usages and principles of law");

7  "The essence of trademark infringement is the likelihood of confusion, and an

8  injunction should be fashioned to prevent just that."  *Internet Specialties West, Inc.*

9  *v. Milon-Digiorgio Enters.*, 559 F.3d 985, 993 (9th Cir. 2009).

10         Finally, Defendants have been using Plaintiff's customer information to sell

11  saunas using the Health Mate brand, which also constitutes irreparable harm.

12  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir.

13  2001) ("Evidence of threatened loss of prospective customers or goodwill certainly

14  supports a finding of the possibility of irreparable harm.") (citation omitted);

15  *WHIC LLC v. NextGen Labs., Inc.*, 341 F. Supp. 3d 1147, 1164-68 (D. Haw. 2018)

16  (granting preliminary injunction where "at minimum, Plaintiff has at least

17  established that there are 'serious questions' as to whether trade secrets are at

18  issue" and the other requirements for a preliminary injunction were met); *H.Q.*

19  *Milton, Inc.*, 2017 U.S. Dist. LEXIS 193646, at *9 (granting temporary restraining

20  order where defendant "was able to freely access [trade secret] information even

21  though he was an independent contractor during his time at [the plaintiff]").

22         The Court should order Defendants to immediately cease using Plaintiff's

23  trade secrets and to disgorge to Plaintiff all of its trade secret information in

24  Defendants' possession, custody or control.  18 U.S.C. § 1836(b)(3)(A)(ii)

25  (providing the court's order may "requir[e] affirmative actions to be taken to

26  protect the trade secret").

27  **IV.    The Balance of Harms Strongly Favors Plaintiff.**

28         In trademark cases, "courts will not shy away from issuing preliminary

injunctive relief, where to do so would be to aid a second comer who has sought to trade upon the efforts and good will of the first comer." *Moroccanoil, Inc. v. Moroccan Gold*, LLC, 590 F. Supp. 2d 1271, 1281 (C.D. Cal. 2008) (internal citation omitted).  Here, Defendants are "intentionally trying to trade upon the efforts and goodwill established by Plaintiff." *Id.* at 1282.  Plaintiff will continue to suffer substantial harm to its reputation, goodwill and customer base if this Court does not issue a temporary restraining order.  Furthermore, unless the Court orders transfer of the www.healthmateparts.com domain name to Plaintiff, Gordon could transfer the domain to another registrant while this case is pending, which would force Plaintiff to file new claims against third parties potentially beyond this Court's jurisdiction.  *Super-Krete Int'l, Inc.*, 712 F. Supp. 2d at 1037 (in cyberpiracy case, possibility that Defendant could sell domain weighed in plaintiff's favor).

Defendants, on the other hand, would suffer little or no cognizable injury from a restraining order. The Court would only be prohibiting Defendants from defrauding the public and profiting from infringement, which is not an injury. *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) ("[A] defendant who knowingly infringes another's copyright cannot complain of the harm that will befall it when properly forced to desist from its infringing activities.") (internal citation omitted); *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) ("Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration on an appeal from a preliminary injunction.") (internal citation omitted), *superseded on other grounds as stated in Apple, Inc. v. Psystar Corp.*, 658 F.3d 1150 (9th Cir. 2011).  Any injury the Defendants suffer would be a loss of illegal fruits of their own bad-faith infringement of Plaintiff's Marks and Logo, which does not weigh in their favor. *Moroccanoil, Inc.*, 590 F. Supp. 2d at 1282 ("[A]ny injury that Defendants may

suffer if preliminarily enjoined may be discounted by the fact that Defendants brought the injury upon themselves by intentionally adopting deceptively similar trademarks and packaging.").

## V.   The Public Interest Also Strongly Favors Preventing Defendants from Continuing to Violate the Law.

The purpose of the Lanham Act is "secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Two Pesos, Inc.*, 505 U.S. at 774.  "As the public has a right not to be deceived or confused, the public interest and goals of the Lanham Act favor an injunction." *Moroccanoil*, 590 F. Supp. at 1282; *see also F.T.C. v. John Beck Amazing Profits, LLC*, 2009 U.S. Dist. LEXIS 130923, at *50 (C.D. Cal. Nov. 17, 2009) (explaining "the public interest in preventing further misleading and deceptive practices is great" and outweighs the defendant's "interest in continuing to advertise and market its products and services in the same manner").  This Court should protect the public interest with an immediate restraining order.

## VI.   The Court Should Not Require Plaintiff to Post a Bond.

The Court has wide discretion "as to the amount of security required, *if any*," when a temporary restraining order or preliminary injunctive relief is granted. *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (emphasis in original). Indeed, the Court may "dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).

The evidence strongly supports findings that both Gordon and Mason have engaged in extensive misconduct.  Accordingly, Plaintiff respectfully requests that the Court issue the requested injunction without requiring it to post a bond.

## VII.   Defendants' Misconduct Justifies Additional Relief.

The Court should order Defendants to preserve all documents, data, tangible

things, and other materials relating to this case, and that they not alter, destroy, or dispose of any such evidence or materials.  *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016) (granting the foregoing "reasonable request" because "litigants are generally obligated to maintain and preserve all documents, data, and tangible things that may be related to the litigation, pursuant to Fed. R. Civ. Pro. 26(a) and 37(e)").

Plaintiff also respectfully requests that the Court order Defendants to file and serve a report under oath within 30 days setting forth in detail the manner and form in which they have complied with the Court's orders.  15 U.S.C. § 1116(a) (permitting court to order such a report); *Am. Auto. Ass'n, Inc. v. AAA Towing/Impound Yard, Inc.*, 2018 WL 4693854, at **3-4 (C.D. Cal. Apr. 26, 2018) (ordering the foregoing report pursuant to 15 U.S.C. § 1116(a)); *see also* 18 U.S.C. § 1836(b)(3)(A)(ii) (providing court may issue injunction "requiring affirmative actions to be taken to protect the trade secret").  Absent such relief, Plaintiff cannot have reasonable assurance that Defendants will comply with the Court's orders.

## CONCLUSION

Plaintiff has shown that it meets either of the two alternative tests developed by the Ninth Circuit for entitlement to injunctive relief.  Plaintiff has demonstrated that success on Plaintiff's claims is, at the very least, probable.  Alternatively, Plaintiff has raised serious questions and shown that the balance of hardship tips in Plaintiff's favor.  Accordingly, Plaintiff respectfully requests that the Court issue the proposed restraining order

Dated: March 13, 2020                              Respectfully submitted,

                                                   ANAND LAW GROUP, P.C.

                                                   By:  /s/ Harvinder S. Anand
                                                   HARVINDER S. ANAND
                                                     Attorneys for Plaintiff
                                                     Samick Music Corp.,
                                                     dba "Health Mate"

-35-

**PROOF OF SERVICE**
*Samick Music Corp. v. Gordon, et al.*
Case No. 8:20-cv-00395 GW (JDEx)

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I, the undersigned, certify and declare that I am employed in the County of Los Angeles, State of California; I am over the age of 18 and not a party to the above-entitled cause; my business address is 790 E. Colorado Blvd, Suite 900, Pasadena, CA 91101.  On March 13, 2020 I served the foregoing document(s) described as:

**PLAINTIFF'S NOTICE OF AND *EX PARTE* APPLICATION FOR ISSUANCE OF TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES**

on the interested parties in this action:

/**X**/     by placing /**/ the original /X / a true copy thereof enclosed in sealed envelopes addressed as follows:

Garrett Gordon
2271 Aria Drive
Henderson, NV 89052

**X**     BY OVERNIGHT MAIL:   I caused to be served the foregoing document(s) by Federal Express, an express service carrier which provides for delivery reasonably calculated to ensure delivery not later than the close of the next business day papers are filed with the court.  I caused true copies of the foregoing document(s) to be placed in a sealed envelope or package designated by the express service carrier, addressed to each interested party as set forth above, with fees for overnight delivery paid or provided.

**X**     BY EMAIL: By electronically mailing the documents(s) listed above to the immediately following email address(es) or to the email address(es) set forth in the attached service list, per agreement or consent of the party or parties, or as a courtesy copy.  Email address served: ggordon@teamvalorem.com.

Executed on March 13, 2020 at Pasadena, California.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

_____
/s/ Harvinder S. Anand
Harvinder S. Anand

-1-